**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MICHAEL SHIELDS, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No.: _____ |
| v. | **CLASS ACTION COMPLAINT** |
| MONDELEZ GLOBAL LLC, | **JURY TRIAL DEMAND** |
| Defendant. | |

Plaintiff Michael Shields ("Plaintiff") brings this Class Action Complaint ("Complaint") against Mondelez Global LLC ("Mondelez" or "Defendant"), as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsels' investigation, and upon information and belief as to all other matters, as follows:

**INTRODUCTION**

1.      Plaintiff brings this Complaint against Mondelez for its failure to properly secure and safeguard the personally identifiable information that it collected and maintained as part of its regular business practices, including, but not limited to: full names; dates of birth; Social Security numbers; addresses, marital status, gender, and employment information (collectively, "personally identifiable information" or "PII").

2.      Mondelēz is a food retailer and is part of one of the largest snack companies in the world. Mondelēz is a wholly owned subsidiary of Mondelēz International, Inc., which had global net revenues of approximately $31.5 billion in 2022.[1]

---

[1] See https://www.mondelezinternational.com/About-Us

3.      Plaintiff's and Class Members' sensitive personal information—which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure—was compromised and unlawfully accessed due to the Data Breach.

4.      Mondelez collected and maintained certain personally identifiable information of Plaintiff and the putative Class Members (defined below), who are (or were) employees at Mondelez.

5.      The PII compromised in the Data Breach was exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals who target PII for its value to identity thieves.

6.      As a result of the Data Breach, Plaintiff and tens of thousands of Class Members, suffered concrete injury in fact including, but not limited to: (i) lost or diminished value of their PII; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; (v) damage to their credit scores; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

7.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect its employees' PII from a foreseeable and preventable cyber-attack.

8.      Defendant maintained the PII in a reckless manner. In particular, the PII was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of

Plaintiff's and Class Members' PII was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

9.      Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices to safeguard Class Members' PII; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

10.     Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct because the PII that Defendant collected and maintained is now in the hands of data thieves.

11.     Armed with the PII accessed in the Data Breach, data thieves have already engaged in identity theft and fraud (including the fraud suffered by Plaintiff described below), and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

12.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

13.     Plaintiff and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

14.     Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' PII that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

15.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose PII was accessed during the Data Breach.

16.     Plaintiff seeks remedies including, but not limited to, compensatory damages and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

17.     Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct.

## PARTIES

### *Plaintiff Michael Shields*

18.     Plaintiff Shields is and has been at all relevant times a resident and citizen of Warminster, Pennsylvania. Mr. Shields received the Notice Letter, via U.S. mail, directly from Defendant, dated June 15, 2023.

19.     If Mr. Shields had known that Defendant would not adequately protect his PII , he would not have provided his PII to Defendant or allowed Defendant to maintain this sensitive PII .

### *Defendant Mondelez*

20.     Defendant is a food retailer limited liability company incorporated under the state laws of Delaware with its principal place of business located at 905 West Fulton Market, Suite 200, Chicago, Illinois 60607.

21.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

22.     All of Plaintiff's claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, including Plaintiff, is a citizen of a state different from Defendant.

24.      This Court has personal jurisdiction over Defendant because its principal place of business is in this District, regularly conducts business in Illinois, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

25.     Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## FACTUAL ALLEGATIONS

### *Background*

26.     Mondelēz is a food retailer and is part of one of the largest snack companies in the world. Mondelēz is a wholly owned subsidiary of Mondelēz International, Inc., which had global net revenues of approximately $31.5 billion in 2022.[2]

27.     Upon information and belief, in the course of collecting PII from employees, including Plaintiff, Defendant promised to provide confidentiality and adequate security for employee data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

28.     Indeed, Defendant's Privacy Policy provides that: "[p]rotecting your personal information is important to us. We maintain administrative, technical, and physical safeguards designed to help protect against unauthorized use, disclosure, alteration, or destruction of the personal information we collect on our Sites."[3]

29.     Plaintiff and the Class Members, as former and current employees of Defendant, relied on these promises and on this sophisticated business entity to keep their sensitive PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Employees, in general, demand security to safeguard their PII, especially when Social Security numbers and other sensitive PII is involved.

30.     In the course of their employment relationship, employees, including Plaintiff and Class Members, provided Defendant with at least the following PII:

    a.   names;

    b.   dates of birth;

    c.   gender;

---

[2] See https://www.mondelezinternational.com/About-Us

[3] https://www.mondelezinternational.com/Privacy-Policy (last visited June 20, 2023).

d. Social Security numbers; and

e. addresses.

31. Defendant had a duty to adopt reasonable measures to protect Plaintiff's and Class Members' PII from involuntary disclosure to third parties.

32. In the Notice of Data Breach letter (the "Notice Letter") sent to Plaintiff and Class Members, Defendant asserts that in "[o]n February 23, 2023, [Defendant] detected unauthorized access to its systems[.]"[4] Defendant subsequently investigated the unauthorized access to its systems, and as a result of that investigation, Defendant concluded that the unauthorized access "occurred from February 23, 2023 until March 1, 2023."[5]

33. Omitted from the Notice Letter were any explanation as to why it took Defendant several days to stop the unauthorized access after detecting the Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their PII remains protected.

34. Upon information and belief, the cyberattack was targeted at Defendant, due to its status as an employer that collects, creates, and maintains PII on its computer networks and/or systems.

35. Upon information and belief, Plaintiff's and Class Members' PII was, in fact, involved in the Data Breach.

---

[4] The "Notice Letter". A sample copy is available at https://apps.web.maine.gov/online/aeviewer/ME/40/ca25f29f-db60-4baf-ba53-8bae79da4d97.shtml (last visited June 20, 2023).

[5] *Id.*

36.     The files, containing Plaintiff's and Class Members' PII and stolen from Defendant, included the following: names, addresses, dates of birth, Social Security numbers, marital status, gender, and employment information.[6]

37.     Because of this targeted cyberattack, data thieves were able to gain access to and obtain data from Defendant that included the PII of Plaintiff and Class Members.

38.     As evidenced by the Data Breach's occurrence, the PII contained in Defendant's network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

39.     Plaintiff's PII was accessed and stolen in the Data Breach and Plaintiff believes his stolen PII is currently available for sale on the dark web because that is the *modus operandi* of cybercriminals.

40.     Due to the actual and imminent risk of identity theft as a result of the Data Breach, Plaintiff and Class Members must, as Defendant's Notice Letter instructs them, "remain vigilant" and monitor their financial accounts for many years to mitigate the risk of identity theft.[7]

41.     In the Notice Letter, Defendant makes an offer of 24 months of identity monitoring services. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, medical and financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' PII.

---

[6] *Id.*

[7] *Id.*

42.     That Defendant is encouraging its current and former employees to enroll in credit monitoring and identity theft restoration services is an acknowledgment that the impacted individuals' PII *was* accessed, thereby subjecting Plaintiff and Class Members to a substantial and imminent threat of fraud and identity theft.

43.     Defendant had obligations created by contract, state and federal law, common law, and industry standards to keep Plaintiff's and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

***Data Breaches Are Preventable***

44.     Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

45.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

46.     The unencrypted PII of Class Members may end up for sale to identity thieves on the dark web, if it has not already, or it could simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

47.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[8]

---

[8] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Oct. 17, 2022).

48. To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[9]

49. To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;
- Include IT Pros in security discussions
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface]

---

[9] *Id.* at 3-4.

for Office [Visual Basic for Applications].[10]

50.     Given that Defendant was storing the PII of its current and former employees and employee applicants, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

51.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of tens of thousands of current and former employees and employee applicants, including Plaintiff and Class Members.

***Defendant Acquires, Collects, and Stores the PII of Plaintiff and Class Members***

52.     Defendant has historically acquired, collected, and stored the PII of Plaintiff and Class Members.

53.     As a condition of employment, or as a condition of receiving certain benefits, Defendant requires that employees, former employees, and other personnel entrust it with highly sensitive personal information.

54.     By obtaining, collecting, and using Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

55.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

---

[10] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Oct. 17, 2022).

56.     Plaintiff and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### Defendant Knew or Should Have Known of the Risk because Employers in Possession of PII are Particularly Susceptible to Cyber Attacks

57.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store other medical information, like Defendant, preceding the date of the breach.

58.     Data breaches, including those perpetrated against employers that store PII in their systems, have become widespread.

59.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.

60.     The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.

61.     Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store PII are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."

62.     In light of recent high profile data breaches at industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May

2020), Defendant knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

63.     Defendant knew and understood that unprotected or exposed PII in the custody of employers, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access.

64.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

65.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

66.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

67.     The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers— fraudulent use of that information and damage to victims may continue for years.

68.     As a business in custody of current and former employees' PII, Defendant knew, or should have known, the importance of safeguarding PII entrusted to them by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached. This

includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

### Value of Personally Identifiable Information

69.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[11] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[12]

70.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[13] For example, Personal Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[14] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[15]

71.     Social Security numbers, which were compromised for some of the Class Members as alleged herein, for example, are among the worst kind of PII to have stolen because they may

---

[11] 17 C.F.R. § 248.201 (2013).

[12] *Id.*

[13] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 17, 2022).
[14] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 17, 2022).

[15] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Oct. 217, 2022).

be put to a variety of fraudulent uses and are difficult for an individual to change. The Social

Security Administration stresses that the loss of an individual's Social Security number, as is the

case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use It to get other
> personal information about you. Identity thieves can use your number and your
> good credit to apply for more credit in your name. Then, they use the credit cards
> and don't pay the bills, it damages your credit. You may not find out that someone
> is using your number until you're turned down        for credit, or you begin to get
> calls from unknown creditors demanding payment for items you never bought.
> Someone illegally using your Social Security number and assuming your identity
> can cause a lot of problems.[16]

72.     What's more, it is no easy task to change or cancel a stolen Social Security number.

An individual cannot obtain a new Social Security number without significant paperwork and

evidence of actual misuse. In other words, preventive action to defend against the possibility of

misuse of a Social Security number is not permitted; an individual must show evidence of actual,

ongoing fraud activity to obtain a new number.

73.     Even then, a new Social Security number may not be effective. According to Julie

Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link

the new number very quickly to the old number, so all of that old bad information is quickly

inherited into the new Social Security number."[17]

74.     Based on the foregoing, the information compromised in the Data Breach is

significantly more valuable than the loss of, for example, credit card information in a retailer data

breach because, there, victims can cancel or close credit and debit card accounts. The information

---

[16] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*:
https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Oct. 17, 2022).

[17] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9,
2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-
millionsworrying-about-identity-theft (last visited Oct. 17, 2022).

compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security number, name, and date of birth.

75.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[18]

76.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

77.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[19]

### *Defendant Fails to Comply with FTC Guidelines*

78.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

---

[18] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Oct. 17, 2022).

[19] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 17, 2022).

79.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal employee information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

80.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

81.     The FTC has brought enforcement actions against employers for failing to protect employee data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

82.     These FTC enforcement actions include actions against employers over the compromised PII of its employees, like Defendant here.

83.     Defendant failed to properly implement basic data security practices.

84. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

85. Upon information and belief, Defendant was at all times fully aware of its obligation to protect the PII of its employees. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *Defendant Fails to Comply with Industry Standards*

86. As noted above, experts studying cyber security routinely identify entities in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

87. Several best practices have been identified that a minimum should be implemented by employers in possession of PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

88. Other best cybersecurity practices that are standard for employers include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

89.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

90.     These foregoing frameworks are existing and applicable industry standards for an employer's obligations to provide adequate data security for its employees. Upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

## COMMON INJURIES AND DAMAGES

91.     As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their PII; and (e) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

### *The Data Breach Increases Plaintiff's and Class Member's Risk of Identity Theft*

92.     The unencrypted PII of Plaintiff and Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands

of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

93.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

94.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

95.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victims.

96.     One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[20]

---

[20] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead

97. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

98. The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

99. The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like phone numbers and emails) of Plaintiff and the other Class Members.

100. Thus, even if certain information (such as emails or telephone numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

101. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/ (last visited on May 26, 2023).

102.     As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

103.     Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Defendant's Notice Letter instructs them, "remain vigilant" and monitor their financial accounts for many years to mitigate the risk of identity theft and fraud.

104.     Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as signing up for credit monitoring and identity theft insurance, closing and opening new credit cards, and securing their financial accounts.

105.     Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[21]

106.     Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity),

---

[21] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

107.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[22]



108.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[23]

***Diminution of Value of PII***

---

[22] "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at: https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited Sep 13, 2022).

[23] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Sep. 13, 2022) ("GAO Report").

109.    PII is a valuable property right.[24] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

110.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[25]

111.    An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[26] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[27,28] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[29]

112.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any

---

[24] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[25] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

[26] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[27] https://datacoup.com/

[28] https://digi.me/what-is-digime/

[29] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

113.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., Social Security numbers and names.

114.    The fraudulent activity resulting from the Data Breach may not come to light for years.

115.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

116.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

117.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to potentially tens of thousands of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

118.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

### *Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary*

119.    Given the type of targeted attack in this case and sophisticated criminal activity, and the type of PII involved in this Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

120.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or his Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

121.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[30] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

---

[30] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

- 27 -

122.    Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

123.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

### Loss of Benefit of the Bargain

124.    Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When accepting employment from Defendant under certain terms, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying, or being paid less, for services and data security to protect the PII, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received employment positions that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

### Plaintiff Shields's Experience

125.    Plaintiff Shields was employed at Mondelez from approximately 2009 to 2012. As a condition of his employment at Mondelez, he was required to provide his PII to Defendant.

126.    At the time of the Data Breach—from February 23, 2023 through March 1, 2023—– Defendant retained Plaintiff's PII in its system, despite the fact that Plaintiff had not been employed with Defendant for over a decade.

127.    Plaintiff Shields is very careful about sharing his sensitive PII. Plaintiff stores any documents containing his PII in a safe and secure location. he has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

128.    Plaintiff Shields received the Notice Letter, by U.S. mail, directly from Defendant, dated June 15, 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties. This sensitive information included Plaintiff's name, address, date of birth, Social Security number, gender, marital status, and employment information.

129.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: signing up for credit monitoring and identity theft insurance, closing and opening new credit cards, and securing his financial accounts. Plaintiff has spent significant time dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

130.    Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (a) his PII being disseminated on the dark web; (b) invasion of privacy; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) the loss of benefit of the bargain (price premium damages); (e) diminution of value of his PII; and (f) the continued risk to his PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's PII.

131.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

132. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

133. Plaintiff Shields has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

134. This action is properly maintainable as a class action. Plaintiff brings this class action on behalf of himself and on behalf of all others similarly situated.

135. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All individuals residing in the United States whose PII was compromised in the data breach first announced by Defendant in June 2023 (the "Class").

136. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

137. Numerosity: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. At least 51,000 individuals were notified by Defendant of the Data Breach, according to the breach report submitted to Maine's Attorney

General's Office.[31] The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

138. Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class, which may affect individual Class members, include, but are not limited to, the following:

a. Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

b. Whether Defendant had respective duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

d. Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

e. Whether and when Defendant actually learned of the Data Breach;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

---

[31] https://apps.web.maine.gov/online/aeviewer/ME/40/ca25f29f-db60-4baf-ba53-8bae79da4d97.shtml (last visited June 20, 2023).

i.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.  Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct; and

k.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

139.    <u>Typicality</u>: Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

140.    <u>Policies Generally Applicable to the Class:</u> This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Nationwide Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

141.    <u>Adequacy</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages he has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

142.    <u>Superiority and Manageability:</u> The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

143.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

144.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class

Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

145.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

146.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

147.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Code of Civil Procedure § 382.

## COUNT I

### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

148.    Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 147 as if fully set forth herein.

149.    Defendant required Plaintiff and Class Members to submit non-public PII as a condition of employment or as a condition of receiving employee benefits

150.    Plaintiff and the Class Members entrusted their PII to Defendant with the understanding that Defendant would safeguard their information and delete it once the employment relationship terminated.

151.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it—

to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

152.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

153.    Section 5 of the FTC Act, as interpreted and enforced by the FTC, prohibits the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the members of the Class's sensitive PII.

154.    Plaintiff and members of the Class are within the class of persons that the FTC Act was intended to protect.

155.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against employers, which, as a result of failures to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm to its employees as that suffered by Plaintiff and members of the Class.

156.    Defendant's conduct constitutes negligence because it was in violation of Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards.

157. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of the Data Breach for companies of Defendant's magnitude, including, specifically, the immense damages that would result to Plaintiff and Members of the Class due to the valuable nature of the PII at issue in this case—including Social Security numbers.

158. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

159. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b. Failing to adequately monitor the security of their networks and systems;

c. Failing to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' PII; and,

e. Failing to detect in a timely manner that Class Members' PII had been compromised.

160. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the food retailer industry.

161. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

162. There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and the harm suffered, or risk of imminent harm suffered by Plaintiff and the Class.

163. As a result of Defendant's negligence, Plaintiff and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: (i) lost or diminished value of their PII; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; (v) damage to their credit scores; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

164. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

165. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II

### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

166.   Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 147 as if fully set forth herein.

167.   Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies, such as Defendant, of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

168.   Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

169.   Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se.*

170.   Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

171.   Moreover, the harm that has occurred is the type of harm that the FTC Act intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

172.   But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

173.   There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed

as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

174. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) lost or diminished value of their PII; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; (v) damage to their credit scores; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

175. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

176. Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

177. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

178.    Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class Members in an unsafe and insecure manner.

179.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT III

### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

180.    Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 147 as if fully set forth herein.

181.    Plaintiff brings this claim for unjust enrichment in the alternative to Count IV (breach of implied contract).

182.    Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of their labor and by providing their valuable PII to Defendant.

183.    Plaintiff and Class Members provided Defendant their labor and PII on the understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices and procedures from the revenue it derived therefrom. In exchange, Plaintiff and Class Members should have received adequate protection and data security for such PII held by Defendant.

184.    Defendant benefited from receiving Plaintiff's and Class Members' labor and from receiving their PII through its ability to retain and use that information for its own benefit. Defendant understood and accepted this benefit.

185.    Defendant knew Plaintiff and Class members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

186.    Because all PII provided by Plaintiff and Class Members was similarly at risk from a foreseeable and targeted data breach, Defendant's obligation to safeguard the PII it collected from its employees was inherent to the employment relationship.

187.    Defendant also understood and appreciated that Plaintiff's and Class Members' PII was private and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

188.    Defendant failed to provide reasonable security, safeguards, and protections to the PII of Plaintiff and Class Members.

189.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff' and Class Members' PII.

190.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead made calculated decisions to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

191.    Under the principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures mandated by industry standards.

192.    Defendant's enrichment at the expense of Plaintiff and Class Members is and was unjust.

193. Defendant acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

194. If Plaintiff and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

195. Plaintiff and Class Members have no adequate remedy at law.

196. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury as described herein.

197. Plaintiff and the Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

## COUNT IV

### BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Class)

198. Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 147 as if fully set forth herein.

199. This count is pleaded in the alternative to Count III (Unjust Enrichment) above.

200. Plaintiff and Class Members were required to provide their PII to Defendant as a condition of their employment with Defendant.

201. Plaintiff and Class Members provided their labor and their PII to Defendant in exchange for (among other things) Defendant's promise to protect their PII from unauthorized disclosure and to delete it once it was no longer necessary to maintain the PII for employment purposes.

Case: 1:23-cv-03999 Document #: 1 Filed: 06/23/23 Page 43 of 48 PageID #:43

202.    Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

203.    On information and belief, Defendant further promised to and represented it would comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

204.    Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

205.    When Plaintiff and Class Members provided their PII to Defendant as a condition of their employment or employee beneficiary status, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

206.    Defendant required Class Members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

207.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

bar

- 43 -

208.    Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

209.    Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

210.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

211.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their PII.

212.    As a direct and proximate result of Defendant's breaches of the implied contracts, Class Members sustained damages as alleged herein.

213.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

214.    Plaintiff and Class Members are also entitled to nominal damages for the breach of implied contract.

215.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Class, as defined herein, and appointing Plaintiff and his Counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii. requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

    iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

    v. prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x. requiring Defendant to conduct regular database scanning and securing checks;

xi. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's

information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.   requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvii.   for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.   For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.   For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.


Date: June 23, 2023                                    Respectfully Submitted,

                                                        /s/   *Gary M. Klinger*
                                                       Gary M. Klinger
                                                       **MILBERG COLEMAN BRYSON**
                                                       **PHILLIPS GROSSMAN, PLLC**
                                                       227 W. Monroe Street, Suite 2100
                                                       Chicago, IL 60606
                                                       Tel.:    (866) 252-0878
                                                       Email: gklinger@milberg.com

                                                       David K. Lietz
                                                       **MILBERG COLEMAN BRYSON**
                                                       **PHILLIPS GROSSMAN, PLLC**
                                                       5335 Wisconsin Avenue NW
                                                       Washington, D.C. 20015-2052
                                                       Telephone: (866) 252-0878
                                                       Facsimile: (202) 686-2877
                                                       dlietz@milberg.com

                                                       *Attorney for Plaintiff and the Putative Class*