# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: MONDELEZ DATA BREACH LITIGATION | Master File No. 1:23-CV-03999 **CONSOLIDATED CLASS ACTION COMPLAINT** **DEMAND FOR JURY TRIAL** |

This Document Relates To: All Actions

Plaintiffs Michael Shields, Daniel Berndt, Augustyn Wiacek, Deidra Clay, and Julio Perez ("Plaintiffs") bring this Consolidated Class Action Complaint ("Complaint") against Mondelēz Global LLC ("Mondelēz" or "Defendant"), as individuals and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsels' investigation, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      Plaintiffs bring this Complaint against Mondelēz for its failure to properly secure and safeguard the personally identifiable information—that it collected, maintained, and disclosed to its outside counsel as part of its regular business practices—including, but not limited to: full names; dates of birth; Social Security numbers; addresses, marital status, gender, and employment information (collectively, "personally identifiable information" or "PII").

2.      Mondelēz is a food retailer that operates in "more than 150 countries[,]" and markets a variety of food products—including for Oreo, Honey Maid, Ritz, and many more brands.[1]

---

[1] *Our Brands*, MONDELĒZ INTERNATIONAL, https://www.mondelezinternational.com/Our-Brands (last accessed Aug. 30, 2023).

3.    Plaintiffs' and Class Members' sensitive personal information—which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure—was compromised and unlawfully accessed due to the data breach ("Data Breach") experienced by Mondelēz's outside counsel.

4.    Mondelēz collected and maintained certain personally identifiable information of Plaintiffs and the putative Class Members (defined below), who are (or were) employees at Mondelēz. Pursuant to Mondelēz's business, Mondelēz shared that PII with its outside counsel who, in turn, stored that information, unencrypted, on its inadequately secured system.

5.    The PII compromised in the Data Breach was exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals who target PII for its value to identity thieves. Defendant betrayed its obligations to Plaintiffs and the other Class Members by failing to properly safeguard and protect their PII and thereby enabling cybercriminals to steal such valuable and sensitive information.

6.    As a result of the Data Breach, Plaintiffs and tens of thousands of Class Members, suffered concrete injuries in fact including, but not limited to: (i) lost or diminished value of their PII; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; (v) damage to their credit scores; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and/or control and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

7.     The Data Breach was a direct result of Defendant's failure to ensure that adequate and reasonable cyber-security procedures and protocols necessary to protect its employees' PII were in place to protect against a foreseeable and preventable cyber-attack.

8.     Defendant maintained the PII in a reckless manner. In particular, the PII was maintained on computer networks in conditions vulnerable to cyberattacks. It was negligent of Defendant to provide Plaintiff's and Class Members' PII and to a third-party who lacked adequate security. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' PII was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

9.     Defendant disregarded the rights of Plaintiffs and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that data systems containing Plaintiffs' and Class Members' PII were protected against unauthorized intrusions; failing to disclose that they did not ensure that adequately robust computer systems and security practices were used to safeguard Class Members' PII; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

10.     Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct. As a result of Defendant's negligence, the PII that Defendant collected and maintained is now in the hands of data thieves.

11.     Armed with the PII accessed in the Data Breach, data thieves have already engaged in identity theft and fraud (including the fraud suffered by Plaintiffs described below), and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class

Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

12. As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

13. Plaintiffs and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

14. Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' PII that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

15. Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose PII was accessed during the Data Breach.

16. Plaintiffs seek remedies including, but not limited to, compensatory damages and injunctive relief including improvements to the relevant data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

17. Accordingly, Plaintiffs bring this action against Defendant seeking redress for its unlawful conduct.

## PARTIES

### *Plaintiff Michael Shields*

18.    Plaintiff Michael Shields is and has been at all relevant times a resident and citizen of Warminster, Pennsylvania where he intends to remain. Mr. Shields received the Notice Letter, via U.S. mail, directly from Defendant, dated June 15, 2023.

### *Plaintiff Daniel Berndt*

19.    Plaintiff Daniel Berndt is and has been at all relevant times a resident and citizen of Illinois where he intends to remain. Mr. Berndt received the Notice Letter from Defendant, sometime shortly after June 15, 2023.

### *Plaintiff Augustyn Wiacek*

20.    Plaintiff Augustyn Wiacek is and has been at all relevant times a resident and citizen of New York where he intends to remain. Mr. Wiacek received the Notice Letter from Defendant, on June 21, 2023.

### *Plaintiff Deidra Clay*

21.    Plaintiff Deidra Clay is and has been at all relevant times a resident and citizen of Greenfield, Ohio where she intends to remain. Ms. Clay received the Notice Letter from Defendant, dated June 15, 2023.

### *Plaintiff Julio Perez*

22.    Plaintiff Julio Perez is and has been at all relevant times a resident and citizen of Texas where he intends to remain. Mr. Perez received the Notice Letter, via U.S. mail, directly from Defendant, on or about June 15, 2023.

*Defendant Mondelēz*

23.     Defendant is a food retailer limited liability company incorporated under the state laws of Delaware with its principal place of business located at 905 West Fulton Market, Suite 200, Chicago, Illinois 60607.

24.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiffs. Plaintiffs will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

25.     All of Plaintiffs' claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, including several Plaintiffs, are citizens of a state different from Defendant.

27.      This Court has personal jurisdiction over Defendant because its principal place of business is in this District, regularly conducts business in Illinois, and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

28.     Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## FACTUAL ALLEGATIONS

### *Background*

29.     Mondelēz is a food retailer that operates in "more than 150 countries[,]" and markets a variety of food products—including for Oreo, Honey Maid, Ritz, and many more brands.[2]

30.     Upon information and belief, in the course of collecting PII from employees, including Plaintiffs, Defendant promised to ensure that confidentiality and adequate security would be provided for employee data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

31.     Indeed, Defendant's Privacy Policy provides that: "[p]rotecting your personal information is important to us. We maintain administrative, technical, and physical safeguards designed to help protect against unauthorized use, disclosure, alteration, or destruction of the personal information we collect on our Sites."[3]

32.     Plaintiffs and the Class Members, as former and current employees of Defendant, relied on these promises and on this sophisticated business entity to keep their sensitive PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Employees, in general, demand security to safeguard their PII, especially when Social Security numbers and other sensitive PII are involved. Among other things, Plaintiffs and Class Members reasonably expected that Defendant would not

---

[2] *Our Brands*, MONDELĒZ INTERNATIONAL, https://www.mondelezinternational.com/Our-Brands (last accessed Aug. 30, 2023).
[3] *Privacy Policy*, MONDELĒZ INTERNATIONAL, as it appeared on February 22, 2023 https://web.archive.org/web/20230222155233/https://www.mondelezinternational.com/Privacy-Policy#otnotice-section-0b809480-5293-4d75-aee1-8c4afd2a12ca (last accessed Sept. 11, 2023).

provide their sensitive PII and to a third-party who lacked adequate data security measures and practices.

33.     In the course of their employment relationship, employees, including Plaintiffs and Class Members, provided Defendant with at least the following PII:

        a.    names;

        b.    dates of birth;

        c.    gender;

        d.    Social Security numbers; and

        e.    addresses.

34.     Defendant had a duty to ensure that reasonable measures were taken to protect Plaintiffs' and Class Members' PII from involuntary disclosure to third parties.

35.     In the Notice of Data Breach letter (the "Notice Letter") sent to Plaintiffs and Class Members, Defendant asserts that "[o]n February 27, 2023, [Defendant's outside counsel] detected unauthorized access to its systems[.]"[4] Defendant subsequently investigated the unauthorized access to the relevant systems, and as a result of that investigation, concluded that the unauthorized access "occurred from February 23, 2023 until March 1, 2023."[5] The investigation further determined that, through this successful infiltration, unauthorized cybercriminals "acquired certain data," including the PII of 51,100 current and former employees of Defendant.[6]

36.     Omitted from the Notice Letter were any explanation of why it took Defendant several days after detecting the Data Breach to stop the unauthorized access, the details of the root

---

[4] *Data Breach Notifications*, MAINE ATTY GEN.,
https://apps.web.maine.gov/online/aeviewer/ME/40/ca25f29f-db60-4baf-ba53-8bae79da4d97.shtml (last accessed Aug. 30, 2023).
[5] *Id.*
[6] *Id.*

cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their PII remains protected.

37.     Upon information and belief, the cyberattack was targeted at Defendant via its outside counsel, due to Defendant's status as an employer that collects, creates, and maintains PII on various computer networks and/or systems.

38.     Upon information and belief, Plaintiffs' and Class Members' PII was, in fact, involved in the Data Breach.

39.     The files, containing Plaintiffs' and Class Members' PII and stolen from Defendant via its outside counsel, included the following: names, addresses, dates of birth, Social Security numbers, marital status, gender, and employment information.[7]

40.     Because of this targeted cyberattack, data thieves were able to gain access to and obtain data from Defendant via its outside counsel that included the PII of Plaintiffs and Class Members.

41.     As evidenced by the Data Breach's occurrence, the infiltrated network was not protected by sufficient multi-layer data security technologies or effective firewalls, the PII of Plaintiffs and Class Members was not encrypted while stored on the network, and Defendant stored PII on the network for longer than was necessary to effect the purpose of sharing the PII.

42.     Similarly, based on the delayed discovery of the Data Breach, it is evident that the infiltrated network, that Defendant allowed to store Plaintiffs' PII, did not have sufficiently effective endpoint detection.

_____

[7] *Id.*

43. Further, the fact that PII was acquired in the Data Breach demonstrates that the PII contained in the infiltrated network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

44. Plaintiffs' PII was accessed and stolen in the Data Breach and Plaintiffs now reasonably believe that their stolen PII is currently available for sale on the dark web because that is the *modus operandi* of cybercriminals.

45. Due to the actual and imminent risk of identity theft as a result of the Data Breach, Plaintiffs and Class Members must, as Defendant's Notice Letter instructs them, "remain vigilant" and to review and monitor their financial accounts for many years to mitigate the risk of identity theft.[8] The Notice Letter also encourages Plaintiffs and Class Members to change their passwords and to temporarily freeze their credit.[9] The Notice Letter additionally warns Plaintiffs and Class Members to on guard for potential "schemes."[10]

46. In the Notice Letter, Defendant makes an offer of 24 months of identity monitoring services. This is wholly inadequate to compensate Plaintiffs and Class Members as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, medical and financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' PII.

47. That Defendant is encouraging its current and former employees to enroll in credit monitoring and identity theft restoration services and is warning Plaintiffs to be on guard for data

---

[8] *Id.*
[9] *Id.*
[10] *Id.*

misuse, is an acknowledgment that the impacted individuals' PII *was* accessed, thereby subjecting Plaintiffs and Class Members to a substantial and imminent threat of fraud and identity theft.

48.     Defendant had obligations created by contract, state and federal law, common law, and industry standards to keep Plaintiffs' and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

### Data Breaches Are Preventable

49.     Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

50.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

51.     The unencrypted PII of Class Members may end up for sale to identity thieves on the dark web, if it has not already, or it could simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the PII of Plaintiffs and Class Members.

52.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of tens of thousands of current and former employees and employee applicants, including Plaintiffs and Class Members.

### Defendant Acquires, Collects, and Stores the PII of Plaintiffs and Class Members

53.     Defendant has historically acquired, collected, shared, and stored the PII of Plaintiffs and Class Members.

54.     As a condition of employment, or as a condition of receiving certain benefits, Defendant requires that its employees, former employees, and other personnel entrust it with highly sensitive personal information.

55.     By obtaining, collecting, using, and sharing with outside counsel Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

56.     Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

57.     Plaintiffs and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### Defendant Knew or Should Have Known of the Risk because Employers in Possession of PII are Particularly Susceptible to Cyber Attacks

58.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store other medical information, like Defendant, preceding the date of the breach.

59.     Data breaches, including those perpetrated against employers that store PII in their systems, have become widespread.

60.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.

61.     Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report

explained, smaller entities that store PII are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."

62.     In light of recent high profile data breaches at industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

63.     Defendant knew and understood that unprotected or exposed PII in the custody and/or control of employers, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access.

64.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members and of the foreseeable consequences that would occur if the relevant data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

65.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

66.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

67.     The ramifications of Defendant's failure to keep secure the PII of Plaintiffs and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

68.     As a business in custody of current and former employees' PII, Defendant knew, or should have known, the importance of safeguarding PII entrusted to them by Plaintiffs and Class Members, and of the foreseeable consequences if the relevant data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

### *Value of Personally Identifiable Information*

69.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[11] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[12]

70.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[13] For example, Personal Information can be sold at a price ranging from $40 to $200,

---

[11] 17 C.F.R. § 248.201 (2013).
[12] *Id.*
[13] *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS, (Oct. 16, 2019) https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

and bank details have a price range of $50 to $200.[14] Criminals can also purchase access to entire

company data breaches from $900 to $4,500.[15]

71.     Social Security numbers, which were compromised for some of the Class Members

as alleged herein, for example, are among the worst kind of PII to have stolen because they may

be put to a variety of fraudulent uses and are difficult for an individual to change. The Social

Security Administration stresses that the loss of an individual's Social Security number, as is the

case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use It to get other
> personal information about you. Identity thieves can use your number and your
> good credit to apply for more credit in your name. Then, they use the credit cards
> and don't pay the bills, it damages your credit. You may not find out that someone
> is using your number until you're turned down     for credit, or you begin to get
> calls from unknown creditors demanding payment for items you never bought.
> Someone illegally using your Social Security number and assuming your identity
> can cause a lot of problems.[16]

72.     What's more, it is no easy task to change or cancel a stolen Social Security number.

An individual cannot obtain a new Social Security number without significant paperwork and

evidence of actual misuse. In other words, preventive action to defend against the possibility of

misuse of a Social Security number is not permitted; an individual must show evidence of actual,

ongoing fraud activity to obtain a new number.

73.     Even then, a new Social Security number may not be effective. According to Julie

Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link

---

[14] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN, (Dec. 6, 2017)
https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-
on-the-dark-web/.
[15] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last
accessed Aug. 30, 2023).
[16] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION,
www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Aug. 30, 2023).

the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[17]

74.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is immutable, i.e., impossible to "close" and difficult, if not impossible, to change—Social Security number, name, and date of birth.

75.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[18]

76.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

77.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may

---

[17] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

[18] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[19]

***Defendant Failed to Comply with FTC Guidelines and Stored Plaintiffs' PII on a Network that Failed to Comply with FTC Guidelines***

78. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

79. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal employee information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

80. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

---

[19] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

81.     The FTC has brought enforcement actions against employers for failing to protect employee data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

82.     These FTC enforcement actions include actions against employers over the compromised PII of its employees, like Defendant here.

83.     Defendant failed to delete PII that was no longer necessary to maintain and failed to encrypt data that it shared and/or stored on third party networks.

84.     Defendant failed to limit its sharing pf PII on third party networks to only the time period necessary to effect the transaction.

85.     Defendant failed to ensure that Plaintiffs' and Class Members' sensitive PII was stored in a network with basic data security practices.

86.     Defendant's failure to ensure that reasonable and appropriate measures were in place to protect against unauthorized access to employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

87.     Upon information and belief, Defendant was at all times fully aware of its obligation to protect the PII of its employees. Defendant was also aware of the significant repercussions that would result from its failure to do so.

***Plaintiffs' PII Was Stored on Network that Fails to Comply with Industry Standards***

88.     As noted above, experts studying cyber security routinely identify entities in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

89.     Several best practices have been identified that at minimum should be implemented by employers in possession and/or control of PII, like Defendant, including but not limited to ensuring that PII is stored on networks with: strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

90.     Other best cybersecurity practices that are standard for employers include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. The infiltrated network, that Defendant allowed to store Plaintiffs' PII, failed to implement these cybersecurity best practices, including failure to train staff.

91.     The infiltrated network, that Defendant allowed to store Plaintiffs' PII, further failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

92.     These foregoing frameworks are existing and applicable industry standards for an employer's obligations to provide adequate data security for its employees. Upon information and belief, Defendant failed to confirm that, or even inquire whether, the network storing its employees' sensitive complied with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

## COMMON INJURIES AND DAMAGES

93.     As a result of Defendant's negligence and the inadequate data security practices that existed on the breached IT network, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their PII; and (e) the continued risk to their PII, which remains in the possession and/or control of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' PII.

### *The Data Breach Increases Plaintiffs' and Class Member's Risk of Identity Theft*

94.     The unencrypted PII of Plaintiffs and Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the PII of Plaintiffs and Class Members.

95.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

96.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

97.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victims.

98.     One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[20]

---

[20] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/.

99.     With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

100.     The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

101.     The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like phone numbers and emails) of Plaintiffs and the other Class Members.

102.     Thus, even if certain information (such as emails or telephone numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

103.     Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

104.     As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud.

Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time has been lost.

105.    Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must, as Defendant's Notice Letter instructs them, "remain vigilant" and monitor their financial accounts for many years to mitigate the risk of identity theft and fraud.

106.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as signing up for credit monitoring and identity theft insurance, closing and opening new credit cards, and securing their financial accounts.

107.    Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[21]

108.    Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

109.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches

---

[21] *See* United States Government Accountability Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/assets/gao-07-737.pdf

("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[22]

### *Diminution of Value of PII*

110.    PII is a valuable property right.[23] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

111.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[24]

112.    An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[25] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[26] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[27]

---

[22] *See* United States Government Accountability Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/assets/gao-07-737.pdf ("GAO Report").

[23] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3–4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[24] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[25] David Lazarus, *Column: Shadowy data brokers make the most of their invisibility cloak*, LOS ANGELES TIMES (Nov. 5, 2019) https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[26] *Home Page*, DATACOUP, https://datacoup.com/ (last accessed Aug. 30, 2023).

[27] *Frequently Asked Questions*, NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last accessed Aug. 30, 2023).

113. As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

114. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., Social Security numbers and names.

115. The fraudulent activity resulting from the Data Breach may not come to light for years.

116. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if the relevant data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

117. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

118. Defendant was, or should have been, fully aware of the unique type and the significant volume of data it allowed to be stored on a vulnerable network, amounting to potentially

tens of thousands of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

119.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to protect the PII of Plaintiffs and Class Members.

### *Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary*

120.    Given the type of targeted attack in this case and sophisticated criminal activity, and the type of PII involved in this Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

121.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

122.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[28] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

---

[28] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

123.    Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

124.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

### Loss of Benefit of the Bargain

125.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When accepting employment from Defendant under certain terms, Plaintiffs and other reasonable consumers understood and expected that they were, in part, paying, or being paid less, for services and data security to protect the PII, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received employment positions that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

### Plaintiff Shield's Experiences

126.    Plaintiff Shields was employed at Mondelēz from approximately 2009 to 2012. As a condition of his employment at Mondelēz, he was required to provide his PII to Defendant.

127.    At the time of the Data Breach—from February 23, 2023, through March 1, 2023— Defendant retained Plaintiffs' PII in the systems that would be the subject of the Data Breach, despite the fact that Plaintiffs had not been employed with Defendant for over a decade.

128.     Plaintiff Shields is very careful about sharing his sensitive PII. Plaintiff stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

129.     Plaintiff Shields received the Notice Letter, by U.S. mail, directly from Defendant, dated June 15, 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties. This sensitive information included Plaintiff's name, address, date of birth, Social Security number, gender, marital status, and employment information.

130.     Because of the Data Breach, Plaintiff's PII is now in the hands of cyber criminals. Plaintiff and all Class Members are now imminently at risk of crippling future identity theft and fraud.

131.     As a result of the Data Breach, Plaintiff has already spent numerous hours responding to the Data Breach.  Among other things, Plaintiff has spent time researching the facts and scope of the Data Breach, monitoring his personal information, reviewing his financial statements for accuracy, and taking other steps in an attempt to mitigate the adverse consequences of the Data Breach.  The letter Plaintiff received from Mondelēz specifically directed him to take these actions. Indeed, the letter stated: "We encourage you to remain vigilant by reviewing account statements and monitoring free credit reports. You should regularly change your passwords. You may want to temporarily freeze your credit. You should be on guard for schemes where malicious actors may pretend to represent Mondelēz or reference this incident."[29]

---

[29] *See Notification of a Potential Data Security Incident*, DEP'T JUST. NEW HAMPSHIRE (June 15, 2023) https://www.doj.nh.gov/consumer/security-breaches/documents/mondelez-global-20230615.pdf.

132.    Plaintiff has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable PII; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff's PII being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff's PII that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff's PII; and (e) continued risk to Plaintiff's PII, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the PII that was entrusted to Defendant.

### *Plaintiff Berndt's Experiences*

133.    Plaintiff Berndt is a former employee of Defendant Mondelēz. As a condition of his employment at Mondelēz, he was required to provide his PII to Defendant.

134.    At the time of the Data Breach—from February 23, 2023, through March 1, 2023—Defendant retained Plaintiffs' PII in the systems that would be the subject of the Data Breach, despite the fact that Plaintiffs had not been employed with Defendant for some time.

135.    Plaintiff Berndt is very careful about sharing his sensitive PII. Plaintiff stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

136.    Plaintiff Berndt received the Notice Letter from Defendant, sometime shortly after June 15, 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained

by unauthorized third parties. This sensitive information included Plaintiff's name, address, date of birth, Social Security number, gender, marital status, and employment information.

137.    Because of the Data Breach, Plaintiff's PII is now in the hands of cyber criminals. Plaintiff and all Class Members are now imminently at risk of crippling future identity theft and fraud.

138.    As a result of the Data Breach, Plaintiff has already spent numerous hours responding to the Data Breach.  Among other things, Plaintiff has spent time researching the facts and scope of the Data Breach, monitoring his personal information, reviewing his financial statements for accuracy, and taking other steps in an attempt to mitigate the adverse consequences of the Data Breach.  The letter Plaintiff received from Mondelēz specifically directed him to take these actions. Indeed, the letter stated: "We encourage you to remain vigilant by reviewing account statements and monitoring free credit reports. You should regularly change your passwords. You may want to temporarily freeze your credit. You should be on guard for schemes where malicious actors may pretend to represent Mondelēz or reference this incident."[30]

139.    Plaintiff has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable PII; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff's PII being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff's PII that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable

---

[30] *See id.*

and adequate data security and failing to protect Plaintiff's PII; and (e) continued risk to Plaintiff's PII, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the PII that was entrusted to Defendant.

***Plaintiff Wiacek's Experiences***

140.    Plaintiff Wiacek is a former employee of Defendant Mondelēz. As a condition of his employment at Mondelēz, he was required to provide his PII to Defendant.

141.    At the time of the Data Breach—from February 23, 2023, through March 1, 2023—Defendant retained Plaintiffs' PII in the relevant systems, despite the fact that Plaintiffs had not been employed with Defendant for some time. Specifically, Plaintiff Wiacek worked for Mondelēz from July 1994 to July 2021.

142.    Plaintiff Wiacek is very careful about sharing his sensitive PII. Plaintiff stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

143.    Plaintiff Wiacek received the Notice Letter, by U.S. mail, directly from Defendant, on June 21, 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties. This sensitive information included Plaintiff's name, address, date of birth, Social Security number, gender, marital status, and employment information.

144.    Because of the Data Breach, Plaintiff's PII is now in the hands of cyber criminals. Plaintiff and all Class Members are now imminently at risk of crippling future identity theft and fraud.

145.    As a result of the Data Breach, Plaintiff has already spent numerous hours responding to the Data Breach. Among other things, Plaintiff has spent time researching the breach online,

changing usernames and passwords for financial and other accounts (including those for his wife and kids), enrolling in credit monitoring, continuously monitoring his accounts, and receiving alerts from credit monitoring agencies in an attempt to mitigate the adverse consequences of the Data Breach. The letter Plaintiff received from Mondelēz specifically directed him to take these actions. Indeed, the letter stated: "We encourage you to remain vigilant by reviewing account statements and monitoring free credit reports. You should regularly change your passwords. You may want to temporarily freeze your credit. You should be on guard for schemes where malicious actors may pretend to represent Mondelēz or reference this incident."[31]

146.    Plaintiff has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable PII; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff's PII being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff's PII that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff's PII; and (e) continued risk to Plaintiff's PII, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the PII that was entrusted to Defendant.

***Plaintiff Clay's Experiences***

---

[31] *See id.*

147.    Plaintiff Clay was employed by Mondelēz in 2013. And as a condition of her employment, Mondelēz required that she disclose her PII.

148.    At the time of the Data Breach—from February 23, 2023, through March 1, 2023—Defendant retained Plaintiff's PII in the relevant systems, despite the fact that Plaintiff had not been employed with Defendant for approximately a decade.

149.    Plaintiff Clay is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

150.    Plaintiff Clay received the Notice Letter from Defendant, dated June 15, 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties. This sensitive information included Plaintiff's name, address, date of birth, Social Security number, gender, marital status, and employment information.

151.    Because of the Data Breach, Plaintiff's PII is now in the hands of cyber criminals. Plaintiff and all Class Members are now imminently at risk of crippling future identity theft and fraud.

152.    As a result of the Data Breach, Plaintiff has already spent numerous hours responding to the Data Breach. Among other things, Plaintiff has spent time researching the facts and scope of the Data Breach, checking in once or twice monthly for any updates from Mondelēz or other available information, monitoring her personal information, reviewing her financial statements for accuracy, and taking other steps in an attempt to mitigate the adverse consequences of the Data Breach. Plaintiff Clay has spent an average of 30–40 minutes a week since her receipt of the Data Breach notice ensuring that no fraudulent transactions have been made with her bank and no fraudulent credit applications have been made in her name.

153.     The letter Plaintiff received from Mondelēz specifically directed her to take these actions.  Indeed, the letter stated: "We encourage you to remain vigilant by reviewing account statements and monitoring free credit reports. You should regularly change your passwords. You may want to temporarily freeze your credit. You should be on guard for schemes where malicious actors may pretend to represent Mondelēz or reference this incident."[32]

154.     Plaintiff has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable PII; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff's PII being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff's PII that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff's PII; and (e) continued risk to Plaintiff's PII, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the PII that was entrusted to Defendant.

### *Plaintiff Perez's Experiences*

155.     Plaintiff Perez was employed by Mondelēz from approximately 2008 to 2013. As a condition of his employment at Mondelēz, he was required to provide his PII to Defendant.

---

[32] *See id.*

156.    At the time of the Data Breach—from February 23, 2023, through March 1, 2023—Defendant retained Plaintiffs' PII in the relevant systems, despite the fact that Plaintiffs had not been employed with Defendant for approximately a decade.

157.    Plaintiff Perez is very careful about sharing his sensitive PII. Plaintiff stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

158.    Plaintiff Perez received the Notice Letter, by U.S. mail, directly from Defendant, on or about June 15, 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties. This sensitive information included Plaintiff's name, address, date of birth, Social Security number, gender, marital status, and employment information.

159.    Because of the Data Breach, Plaintiff's PII is now in the hands of cyber criminals. Plaintiff and all Class Members are now imminently at risk of crippling future identity theft and fraud.

160.    As a result of the Data Breach, Plaintiff has already spent numerous hours responding to the Data Breach. Among other things, Plaintiff has spent time researching the facts and scope of the Data Breach, monitoring his personal information and credit score, reviewing his financial statements for accuracy, and monitoring his social security account for illicit activity, all in an attempt to mitigate the adverse consequences of the Data Breach. The letter Plaintiff received from Mondelēz specifically directed him to take these actions. Indeed, the letter stated: "We encourage you to remain vigilant by reviewing account statements and monitoring free credit reports. You should regularly change your passwords. You may want to temporarily freeze your credit. You

should be on guard for schemes where malicious actors may pretend to represent Mondelēz or reference this incident."[33]

161.    Plaintiff has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable PII; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff's PII being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff's PII that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff's PII; and (e) continued risk to Plaintiff's PII, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the PII that was entrusted to Defendant.

162.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, all Plaintiffs made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: signing up for credit monitoring and identity theft insurance, closing and opening new credit cards, and securing their financial accounts. All Plaintiffs have spent significant time dealing with the Data Breach, valuable time Plaintiffs otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

---

[33] *See id.*

163.     The Data Breach has caused all Plaintiffs to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

164.     As a result of the Data Breach, all Plaintiffs anticipate spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, all Plaintiffs are at present risk and will continue to be at increased risk of identity theft and fraud for years to come.

165.     All Plaintiffs have a continuing interest in ensuring that their PII, which, upon information and belief, remains backed up in Defendant's possession and/or control, is protected and safeguarded from future breaches.

### CLASS ALLEGATIONS

166.     This action is properly maintainable as a class action. Plaintiffs bring this class action on behalf of themselves and on behalf of all others similarly situated.

167.     Plaintiffs proposes the following Class definition, subject to amendment as appropriate:

> All individuals residing in the United States whose PII was compromised in the data breach first announced by Defendant in June 2023 (the "Class").

168.     Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

169.     <u>Numerosity</u>: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. At least 51,000 individuals were notified by

Defendant of the Data Breach, according to the breach report submitted to Maine's Attorney General's Office.[34] The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

170. Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class, which may affect individual Class members, include, but are not limited to, the following:

a. Whether and to what extent Defendant had a duty to protect the PII of Plaintiffs and Class Members;

b. Whether Defendant had respective duties not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant had respective duties not to use the PII of Plaintiffs and Class Members for non-business purposes;

d. Whether Defendant failed to adequately safeguard the PII of Plaintiffs and Class Members;

e. Whether and when Defendant actually learned of the Data Breach;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their PII had been compromised;

---

[34] *Data Breach Notifications*, MAINE ATTY GEN., https://apps.web.maine.gov/online/aeviewer/ME/40/ca25f29f-db60-4baf-ba53-8bae79da4d97.shtml (last accessed Aug. 30, 2023).

h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.  Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct; and

k.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

171.  Typicality: Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, were exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

172.  Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Nationwide Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

173.  Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the

Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

174.    Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

175.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

176. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

177. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

178. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

179. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

## COUNT I
### Negligence
**(On Behalf of Plaintiffs and the Class)**

180. Plaintiffs reallege all previous paragraphs as if fully set forth below.

181. Defendant required Plaintiffs and Class Members to submit non-public PII as a condition of employment or as a condition of receiving employee benefits.

182. Plaintiffs and the Class Members entrusted their PII to Defendant with the understanding that Defendant would safeguard their information and delete it once the employment relationship terminated.

183. By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable

means to secure and safeguard Class Members' PII—and the computer protected that held it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of the relevant security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

184.    Defendant had a duty to ensure that the networks storing Plaintiffs' PII utilized reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

185.    Section 5 of the FTC Act, as interpreted and enforced by the FTC, prohibits the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs and the members of the Class's sensitive PII.

186.    Plaintiffs and members of the Class are within the class of persons that the FTC Act was intended to protect.

187.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against employers, which, as a result of failures to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm to its employees as that suffered by Plaintiffs and members of the Class.

188.    Defendant's conduct constitutes negligence because the network that it allowed to store Plaintiffs' PII was in violation of Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards.

189.    Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of the Data Breach for companies of Defendant's magnitude, including, specifically, the immense damages that would result to Plaintiffs and Members of the Class due to the valuable nature of the PII at issue in this case—including Social Security numbers.

190.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

191.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

      a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

      b.    Failing to adequately monitor the security of the relevant networks and systems;

      c.    Failing to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

      d.    Allowing unauthorized access to Class Members' PII; and,

      e.    Failing to detect in a timely manner that Class Members' PII had been compromised.

192.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the food retailer industry.

193.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

194.    There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and the harm suffered, or risk of imminent harm suffered by Plaintiffs and the Class.

195.    As a result of Defendant's negligence, Plaintiffs and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: (i) lost or diminished value of their PII; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; (v) damage to their credit scores; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and/or control and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

196.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

197.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) replace or strengthen the relevant data security systems and monitoring

procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Negligence *Per Se*
### (On Behalf of Plaintiffs and the Class)

198.    Plaintiffs reallege all previous paragraphs as if fully set forth below.

199.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies, such as Defendant, of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

200.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and by, inter alia, not ensuring that the network it allowed to stored Plaintiffs' PII complied with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on the relevant systems.

201.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se.*

202.    Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

203.    Moreover, the harm that has occurred is the type of harm that the FTC Act intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

204.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Class, the PII of Plaintiffs and the Class would not have been compromised.

205. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The PII of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

206. As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) lost or diminished value of their PII; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; (v) damage to their credit scores; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and/or control and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

207. As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

208. Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and/or control and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession and/or control.

209. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

210. Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiffs and Class Members in an unsafe and insecure manner.

211. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) replace or strengthen the relevant data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT III**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

212. Plaintiffs reallege all previous paragraphs as if fully set forth below.

213. Plaintiffs bring this claim for unjust enrichment in the alternative to Count IV (breach of implied contract).

214. Plaintiffs and Class Members conferred a monetary benefit upon Defendant in the form of their labor and by providing their valuable PII to Defendant.

215. Plaintiffs and Class Members provided Defendant their labor and PII on the understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices and procedures from the revenue it derived therefrom. In exchange, Plaintiffs and Class Members should have received adequate protection and data security for such PII held by Defendant.

216. Defendant benefited from receiving Plaintiffs' and Class Members' labor and from receiving their PII through its ability to retain and use that information for its own benefit. Defendant understood and accepted this benefit.

217. Defendant knew Plaintiffs and Class members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiffs and Class Members for business purposes.

218. Because all PII provided by Plaintiffs and Class Members was similarly at risk from a foreseeable and targeted data breach, Defendant's obligation to safeguard the PII it collected from its employees was inherent to the employment relationship.

219. Defendant also understood and appreciated that Plaintiffs' and Class Members' PII was private and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

220. Defendant failed to provide reasonable security, safeguards, and protections to the PII of Plaintiffs and Class Members.

221. Defendant enriched itself by saving the costs it reasonably should have expended to ensure that data security measures were in place on the networks that stored Plaintiffs' PII to secure Plaintiff' and Class Members' PII.

222. Plaintiffs and Class Members suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

223. Under the principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiffs and Class Members, because Defendant failed to protect Plaintiffs' PII and failed to ensure that Plaintiffs' PII was stored on systems that utilized basic security measures, including those mandated by industry standards.

224. Defendant's enrichment at the expense of Plaintiffs and Class Members is and was unjust.

225.     Defendant acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

226.     If Plaintiffs and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

227.     Plaintiffs and Class Members have no adequate remedy at law.

228.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury as described herein.

229.     Plaintiffs and the Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

**COUNT IV**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

230.     Plaintiffs reallege all previous paragraphs as if fully set forth below.

231.     This count is pleaded in the alternative to Count III (Unjust Enrichment) above.

232.     Plaintiffs and Class Members were required to provide their PII to Defendant as a condition of their employment with Defendant.

233.     Plaintiffs and Class Members provided their labor and their PII to Defendant in exchange for (among other things) Defendant's promise to protect their PII from unauthorized disclosure and to delete it once it was no longer necessary to maintain the PII for employment purposes.

234.     Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiffs and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

235. On information and belief, Defendant further promised to and represented it would comply with industry standards and to make sure that Plaintiffs' and Class Members' PII would remain protected.

236. Implicit in the agreement between Plaintiffs and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

237. When Plaintiffs and Class Members provided their PII to Defendant as a condition of their employment or employee beneficiary status, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

238. Defendant required Class Members to provide their PII as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their PII to Defendant.

239. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

240. Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

241.    Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of its implied promise to monitor the computer systems and networks that store Plaintiffs' PII to ensure that they adopted reasonable data security measures.

242.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

243.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their PII.

244.    As a direct and proximate result of Defendant's breaches of the implied contracts, Class Members sustained damages as alleged herein.

245.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

246.    Plaintiffs and Class Members are also entitled to nominal damages for the breach of implied contract.

247.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) replace or strengthen the relevant data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### COUNT VI
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Class)**

248.    Plaintiffs reallege all previous paragraphs as if fully set forth below.

249.    Plaintiffs and Class Members had a legitimate expectation of privacy regarding their PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

250.     Defendant owed a duty to Plaintiffs and Class Member to ensure that their PII was kept confidential. As such, Defendant cannot abandon its duty when it shares that PII to its outside counsel.

251.     Defendant affirmatively and recklessly disclosed Plaintiffs' and Class Members' PII to unauthorized third parties via Defendant's failure to ensure proper data security.

252.     The unauthorized disclosure and/or acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' PII is highly offensive to a reasonable person.

253.     Defendant's reckless and negligent failure to protect Plaintiffs' and Class Members' PII constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

254.     Defendant's failure to protect Plaintiffs' and Class Members' PII acted with a knowing state of mind when it permitted the Data Breach because it knew the relevant information security practices were inadequate.

255.     Defendant knowingly did not notify Plaintiffs and Class Members in a timely fashion about the Data Breach.

256.     Because Defendant failed to properly safeguard Plaintiffs' and Class Members' PII, Defendant had notice and knew that the relevant inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

257.     As a proximate result of Defendant's acts and omissions, Plaintiffs' and the Class Members' private and sensitive PII was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

258.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII are still within Defendant's custody and/or control—but are subject to inadequate cybersecurity systems and policies.

259.    Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession and/or control of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard Plaintiffs' and the Class's PII.

260.    Plaintiffs, on behalf of themselves and Class Members, seek injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' PII.

261.    Plaintiffs, on behalf of themselves and Class Members, seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

<u>**COUNT VII**</u>
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA")**
**815 Ill. Comp. Stat. §§ 505/1, *et seq*.**
**(On Behalf of Plaintiffs and the Class)**

262.    Plaintiffs reallege all previous paragraphs as if fully set forth below.

263.    Plaintiffs and the Class are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e). Plaintiffs, the Class, and Defendant are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

264.    Defendant engaged in "trade" or "commerce," including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f). And pursuant to Defendant's "trade" or "commerce," Defendant disclosed Plaintiffs and Class Members' PII to its outside counsel.

Moreover, Defendant engages in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

265.    Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment and omission of material facts in connection with the sale and advertisement of their services in violation of the CFA, including: (i) failing to maintain and/or ensure that adequate data security was used—including by Defendant's outside counsel—as to keep Plaintiffs' and the Class Members' sensitive PII from being stolen by cybercriminals and failing to comply with applicable state and federal laws and industry standards pertaining to data security, including the FTC Act; (ii) failing to disclose or omitting materials facts to Plaintiffs and the Class regarding the lack of adequate data security and inability or unwillingness to properly secure and protect the PII of Plaintiffs and the Class; (iii) failing to disclose or omitting materials facts to Plaintiffs and the Class about Defendant's failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the PII of Plaintiffs and the Class; and (iv) failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiffs' and the Class's PII and other personal information from further unauthorized disclosure, release, data breaches, and theft.

266.    These actions also constitute deceptive and unfair acts or practices because Defendant knew the facts about the inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by Plaintiffs and the Class and defeat their reasonable expectations about the security of their PII.

267.    Defendant intended that Plaintiffs and the Class rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendant's offering of goods and services.

268.    Defendant's wrongful practices were and are injurious to the public because those practices were part of Defendant's generalized course of conduct that applied to the Class. Plaintiffs and the Class have been adversely affected by Defendant's conduct and the public was and is at risk as a result thereof.

269.    Defendant also violated 815 ILCS 505/2 by failing to immediately notify Plaintiffs and the Class of the nature and extent of the Data Breach pursuant to the Illinois Personal Information Protection Act, 815 ILCS 530/1, *et seq*.

270.    As a result of Defendant's wrongful conduct, Plaintiffs and the Class were injured in that they never would have provided their PII to Defendant, or purchased Defendant's services, had they known or been told that Defendant failed to maintain and/or ensure sufficient security as to keep their PII from being hacked and taken and misused by others.

271.    As a direct and proximate result of Defendant's violations of the CFA, Plaintiffs and the Class have suffered harm: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and/or control and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect PII in their continued possession and/or control; and (vii) future costs in terms of time, effort, and money that will be expended to

prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

272.    Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiffs and the Class seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendant's violations of the CFA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.    requiring Defendant to delete, destroy, and purge the personal identifying

information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.  requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

v.  prohibiting Defendant from maintaining the PII of Plaintiffs and Class Members on a cloud-based database;

vi.  requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on the relevant systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.  requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.  requiring Defendant to audit, test, and train security personnel regarding any new or modified procedures;

ix.  requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of the relevant networks are compromised, hackers cannot gain access to other portions of the relevant systems;

x.  requiring Defendant to conduct regular database scanning and securing checks;

xi.  requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with

additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.  requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and the relevant systems for protecting personal identifying information;

xiv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor the relevant information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from the relevant servers; and

xvii.  for a period of 10 years, appointing a qualified and independent third-party

assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate

Defendant's compliance with the terms of the Court's final judgment, to provide

such report to the Court and to counsel for the class, and to report any

deficiencies with compliance of the Court's final judgment;

D.   For an award of damages, including actual, statutory, nominal, and consequential

damages, as allowed by law in an amount to be determined;

E.   For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.   For prejudgment interest on all amounts awarded; and

G.   Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.


Date: September 14, 2023                          Respectfully Submitted,

                                                  /s/ *Gary M. Klinger*_____
                                                  Gary M. Klinger
                                                  **MILBERG COLEMAN BRYSON**
                                                  **PHILLIPS GROSSMAN, PLLC**
                                                  227 W. Monroe Street, Suite 2100
                                                  Chicago, IL 60606
                                                  Tel.:   (866) 252-0878
                                                  Email: gklinger@milberg.com

                                                  A. Brooke Murphy*
                                                  MURPHY LAW FIRM
                                                  4116 Will Rogers Pkwy, Suite 700
                                                  Oklahoma City, Oklahoma 73108
                                                  (405) 389-4989
                                                  abm@murphylegalfirm.com

                                                  Raina C. Borrelli
                                                  Samuel J. Strauss
                                                  Brittany Resch
                                                  TURKE & STRAUSS LLP

613 Williamson St., Suite 201
Madison, WI 53703
Telephone: (608) 237-1775
Facsimile: (608) 509-4423
raina@turkestrauss.com
sam@turkestrauss.com
brittanyr@turkestrauss.com

*Interim Co-Lead Class Counsel*

**LAUKAITIS LAW LLC**
Kevin Laukaitis
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
T: (215) 789-4462
klaukaitis@laukaitislaw.com

Daniel Srourian
(CA S.B. #285678)
SROURIAN LAW FIRM, P.C.
3435 Wilshire Blvd., Suite 1710
Los Angeles, CA 90010
Telephone: (213) 474-3800
Email: daniel@slfla.com

*Additional Counsel for Plaintiffs and the
Putative  Class*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on September 14, 2023 the foregoing document was filed via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.

*/s/ Gary M. Klinger*
Gary M. Klinger
